IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 4, 2019 Session

## STATE OF TENNESSEE v. KENDRICK RIVERS

**Appeal from the Circuit Court for Lake County**
**No. 16-CR-10223    R. Lee Moore, Jr., Judge**

———————————————————

### No. W2018-00861-CCA-R3-CD

———————————————————

Defendant, Kendrick Rivers,[1] was found guilty of aggravated assault in concert with two or more other persons after an incident at Northwest Correctional Complex ("Northwest") in Tiptonville, Tennessee, during which a correctional officer was attacked by several inmates. As a result of the conviction, Defendant was sentenced to fifteen years in incarceration. On appeal, Defendant argues that the evidence was insufficient to support the conviction, that the trial court erred in refusing to allow Defendant to introduce another inmate's conviction for the same offense, and that the trial court erred in sentencing Defendant. For the following reasons, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., and JOHN EVERETT WILLIAMS, P.J, joined.

David Camp, Jackson, Tennessee, for the appellant, Kendrick Rivers.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Lance Webb, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Defendant and Darrell Lamont Fleming, Jr., were indicted by a Lake County grand jury in July of 2016 for attempted first degree murder and aggravated assault for their

---

[1] Defendant testified at trial that his name is actually "Kenrick" Rivers. However, we will refer to him as Defendant or Kendrick Rivers, as that is the name listed on the indictment.

role in an attack on Officer Shannon Williamson at Northwest. Defendant filed a motion to sever his case from the codefendants, Mr. Fleming and Kaleb Tate, because they were "indicted on the same charges as the movant."[2] The motion goes on to explain that the severance was necessary because Mr. Tate had already pled guilty to the offense and Mr. Fleming gave a statement implicating Defendant in the offense that could not be redacted. The trial court granted the motion to sever. Prior to trial, the State nolle prossed the attempted first degree murder charge in Count One of the indictment.

At trial, the following facts were introduced. On September 2, 2014, Defendant, Mr. Fleming, and Mr. Tate were all inmates at Northwest. The correctional facility was arranged in pods. Each pod contained cells on two "tiers" or levels, with thirty-four cells on the upper tier and thirty cells on the lower tier. On the lower tier, located in the center, was a protected area referred to as "the cage" where correctional officers could complete paperwork and maintain a safe position as they supervised activities within the pod. Defendant, Mr. Fleming, and Mr. Tate were all housed in Pod Nine. Defendant's cell was located on the first tier.

Officer Shannon Williamson, a correctional officer at Northwest, was the only officer working in Pod Nine on the day of the incident. Pod Nine contained approximately 128 inmates. Officer Williamson acknowledged that department policy regarding tier management was in place at the time of the incident. Tier management involved allowing only inmates on one tier out of their cells at a time. He "tried" to follow that policy but acknowledged that he was not completely successful.

According to Officer Williamson, Defendant wanted to get back into his cell after Officer Williamson "got a call on the radio saying that it was [recreation time for] the top tier." Officer Williamson "just told him to hold on and stuff and [he] would let [Defendant] in his cell" after he "let out the top tier for rec." Officer Williamson explained that Defendant "wanted to argue [with him] a little bit." Officer Williamson returned to Defendant's cell about fifteen or twenty minutes later. Mr. Tate was standing outside the cell with Defendant. Officer Williamson recalled that "another inmate c[a]me to [Defendant's] cell and they w[ere] standing at each - - each side of the doorway. And [Defendant] pushed the door wide open and said if I try to shut it, to hurt me." Officer

---

[2] The indictment included in the technical record for case number 16-CR-10223 names only Mr. Fleming and Defendant and does not mention Mr. Tate. From what we can gather from discussion among counsel and the trial court, there were several different iterations of the indictment. The first charged Defendant and Mr. Tate with attempted first degree murder and aggravated assault; another added a charge for a gang enhancement that was later removed after the gang enhancement statute was declared unconstitutional; and the third charged Defendant with attempted first degree murder and aggravated assault in concert with two or more others. The only indictment in the record on appeal charges both Defendant and Mr. Fleming with attempted first degree murder and aggravated assault with two or more others.

- 2 -

Williamson turned around and "went to the cage," letting Defendant stay in his cell while it was open.

A short time later, Defendant came out of his cell and approached Officer Williamson while he was standing near the cage. According to Officer Williamson, Defendant was "trying to argue" or "pick a fight." The officer agreed that Defendant appeared angry. Officer Williamson told Defendant that he was not "going to deal with it," so he intended to go back to the cage and start writing in his log. Officer Williamson's next memory is of being "on the ground" with someone hitting him on his back. Once the assault was over, Officer Williamson was able to get up and press the emergency button on his radio, walk to the cage, and shut the door, but he had no other recollection of the incident. As a result of his injuries, Officer Williamson was out of work for approximately three months.

Officer Williamson denied using the "N" word and acknowledged that the use of the word would violate the policies of the Department of Correction.

David Abel of the Tennessee Department of Correction, Office of Investigation and Compliance, worked as the Institutional Investigator at Northwest. Investigator Abel testified that the facility housed about 2400 inmates and was equipped with video surveillance cameras. The cameras did not record audio. Investigator Abel was notified within less than fifteen minutes of the incident during which Officer Williamson was attacked by three inmates. After being notified of the incident, he began an investigation. As part of the investigation, Investigator Abel retrieved video from the surveillance cameras.

At trial, the jury viewed video of the incident. The video cameras at Northwest provided viewpoints from several camera angles. The common area of the pod and "cage" can be seen in several of the camera angles. At time stamp 20:42:00, Officer Williamson can be seen talking to an inmate outside the open door of the "cage." Approximately twenty-five seconds later, two additional inmates can be seen approaching Officer Williamson. At time stamp 20:42:29, another inmate skips or walks quickly diagonally across the pod from the area near the stairs toward the cage and punches Officer Williamson near his head. The inmate knocks Officer Williamson to the floor. Officer Williamson puts his hands near his face. At time stamp 20:42:34, two other inmates can be seen joining in, punching and kicking Officer Williamson. One of the inmates, later identified as Defendant, picks up a floor buffer and throws it at Officer Williamson at time stamp 20:42:35. At that time, Officer Williamson moves into a fetal position on the floor. At time stamp 20:42:48, the inmates walk away and Officer Williamson rises to his feet and walks to the cage, where he leaves the door open. At time stamp 20:43:54, two additional officers are seen running into the pod. A third

officer enters the pod at time stamp 20:44:14. Several of the officers are seen leaving the pod a few minutes later.

Officer Tommy Gurien was one of the officers that responded to the pod after the emergency call. He described Officer Williamson as "loopy" after the attack. Officer Williamson was "really swollen to one side and had some marks across his head." He thought that Officer Williamson identified "Tate" as one of the attackers.

As the video was playing for the jury, Investigator Abel identified Defendant, Mr. Tate, and Mr. Fleming as the inmates depicted in the video. In fact, all three inmates were standing near each other prior to the attack. Investigator Abel identified Defendant as the person interacting with Officer Williamson prior to the assault. Investigator Abel identified Mr. Tate as the first inmate moving across the pod before striking Officer Williamson. According to Investigator Abel, Mr. Fleming joined Mr. Tate in the attack shortly thereafter. Investigator Able confirmed that Defendant was the inmate picking up a floor buffer and throwing it at the officer's head. According to Investigator Abel, the floor buffer weighed approximately ninety-nine pounds.

Mr. Tate was called to testify for the defense. Prior to his testimony, counsel for the State objected to any testimony with regard to the offense to which Mr. Tate ultimately pled. Counsel for Defendant confirmed that Mr. Tate was charged in one version of the indictment along with Defendant but that he entered a best interest guilty plea to aggravated assault prior to trial and did not plead guilty in exchange for his testimony. The trial court sustained the objection, prohibiting counsel for Defendant from questioning Mr. Tate about his guilty plea and/or involvement in the assault on Officer Williamson. Counsel for Defendant made an offer of proof in which Mr. Tate confirmed that he pled guilty to aggravated assault and chose to plead guilty based on the evidence with which he was confronted.

When Mr. Tate testified at trial, he explained that he was incarcerated at Northwest on a fifteen-year sentence for second-degree murder. Mr. Tate was incarcerated in Pod Nine with Defendant and Mr. Fleming. Mr. Tate identified Pod Nine and Officer Williamson on the video. Mr. Tate was unable to identify the inmate to whom Officer Williamson is seen talking prior to the attack. Mr. Tate explained that just prior to the attack, Officer Williamson "disrespected" him by calling him "everything under the sun of God." According to Mr. Tate, Officer Williamson called him a "n****r" and "all type of different slogans and slangs he was throwing at me that day." Mr. Tate explained that if he ignored the disrespectful statements, he could "get beat, sent to PC,[3] [or] might even get killed" by other inmates. Mr. Tate explained that if he attacked an officer in retaliation for disrespect, he would most likely get placed in "the

_____

[3] Mr. Tate does not explain what the initials PC stand for during his testimony.

- 4 -

hole" away from other inmates, thereby avoiding an attack by other inmates.  Mr. Tate denied that Defendant encouraged or was involved in planning the attack, instead claiming Mr. Tate "chose to do this on [his] own."  Mr. Tate was unable to identify one of the inmates standing next to him on the video.  He explained that at the time of the incident, his "blood was pumping," and he was not paying attention to who was around him.  He admitted that he later learned that Defendant and Mr. Fleming were implicated in the attack.

Another inmate, Paul Sanders, gave his recollection of the attack.  At the time, he was housed on the upper tier of Pod Nine.  During the attack, he was not inside his cell as required by the tier management policy.  According to Mr. Sanders, "they were trying to enforce [tier management], but . . . it really wasn't working."  Mr. Sanders heard "yelling and just arguing" prior to the attack.  He looked at the bottom tier, and "there was a commotion going on."  From what Mr. Sanders could gather, the argument was about Defendant "trying to get . . . in a cell quick."  Mr. Sanders heard Officer Williamson "calling names" like "boy" and "n****r."  Mr. Sanders explained that "if you don't act" when someone "like the police or a white person" are disrespectful, it can cause "[a] list of problems," like being "robbed every day, beat up every day," or even killed.  Mr. Sanders testified that he had heard Officer Williamson using derogatory terms toward inmates before that day but that he had never heard him using the word "n****r" before.

Freddie Long, another inmate at Northwest, testified that he was housed on the upper tier of Pod Nine on the day of the attack.  Mr. Long explained that tier management was not being followed in Pod Nine.  He witnessed the incident from downstairs but explained that he was not visible in the recording.  Mr. Long heard "[a] couple of inmates . . . talking to [Officer] Williamson about what he was saying, and just a whole lot of stuff."  Mr. Long heard Officer Williamson tell the "monkeys" to "pipe down."  Anywhere from 10 to 20 minutes before the attack, Mr. Long heard Officer Williamson say, "I don't know what y'all - - what y'all n*****rs think this is."  Mr. Long called the comment "disrespectful" and expected that there would be an altercation as a result of the statement.  Mr. Long thought that Defendant was in the shower when Officer Williamson used the derogatory language.

Defendant testified at trial.  He confirmed that he was an inmate on the lower tier of Pod Nine at Northwest on the day of the incident.  He recalled being let out of his cell to take a shower.  Defendant was in the shower for about ten minutes.  He "came back out the shower and went to [his] cell," where he "was standing there waiting on [Officer Williamson] to come open the door."  Defendant was "vulnerable" because he was wearing "shower shoes and just some - - a pair of short pants."  He asked Officer Williamson to open his cell door, "[b]ut he ke[pt] refusing and just ke[pt] walking doing everything else."  So, Defendant went to the "cage" and asked the officer again to open the cell door.  Defendant claims Officer Williamson told him he would let Defendant "in

[his cell] when he get ready." Defendant "slammed the door on the cage and walked back toward [his] cell." Defendant witnessed a discussion between Officer Williamson and an inmate identified as "McKissack" during which the inmate was asking the officer "why he keep disrespecting inmates." Defendant explained that "McKissack" was "using the 'N' word first," explaining to Officer Williamson that the use of the word was disrespectful and would "get him messed up." At that point, Officer Williamson told "McKissack" that he was not talking to him, and the officer pointed at Defendant and said "he was talking to this stupid-ass n****r over there." At that point, Defendant walked toward Officer Williamson and told him he was "going to get a MF F'd up." Defendant claimed that Officer Williamson pushed his hand and shoved him. Defendant explained that he would look like a coward if he did not react to the officer's verbal assault. Defendant further explained that if he "didn't react to his - - what he - - his action, [he] knew something was going to happen to [him]." Defendant picked up the floor buffer "to secure [his] safety" and because he was in fear. He explained that he would be moved out of the pod and would not have to deal with the other inmates. Defendant claimed that the floor buffer hit the officer in the chest area, not in the head. Defendant acknowledged that he had a parole hearing coming up on November 1, about two months after the incident.

The jury found Defendant guilty of aggravated assault in concert with two or more other persons as charged in the indictment. The trial court sentenced Defendant as a Range II, Multiple Offender, to fifteen years in incarceration to run consecutively to "all prior sentences."

Defendant filed a motion for new trial in which he argued that the evidence was insufficient and that his sentence was excessive. Counsel for Defendant did not file an amended motion for new trial, but at the hearing on the motion for new trial, counsel for Defendant noted that Defendant was "reiterating any of the objections raised during trial," especially the instruction on the "justification defense." Additionally, counsel for Defendant complained that Defendant did not receive pretrial jail credit on his sentence. The trial court denied the motion for new trial.

Defendant filed a timely notice of appeal. On appeal, he challenges the sufficiency of the evidence, the trial court's decision to prohibit the introduction of Mr. Tate's conviction into evidence, and his sentence.

*Analysis*

*I. Admissibility of Mr. Tate's Conviction for Aggravated Assault*

Defendant argues on appeal that the trial court erred in "prohibiting [Defendant] from introducing the conviction of Kaleb Tate for aggravated assault instead of

aggravated assault acting in concert with two (2) or more other persons." The State argues that the trial court properly excluded the evidence because it was irrelevant and that Defendant waived this issue for failing to cite authority to support his proposition.

Neither party acknowledges that Defendant failed to raise this issue in his motion for new trial. According to Tennessee Rule of Appellate Procedure 3(e), "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Defendant's failure to include this issue in a motion for new trial constitutes a waiver of the issue on appeal. Such a broad assertion at a motion for new trial hearing that a defendant is "reiterating any objections raised during trial," with nothing more, fails to give the trial court an opportunity to correct an action later labeled as "error." Moreover, Defendant fails to seek plain error review under Tennessee Rule of Appellate Procedure 36(b). This issue is waived.

## II. Sufficiency of the Evidence

Defendant argues that the evidence is insufficient to support his conviction. Specifically, he contends that there was no proof he was acting in concert with Mr. Tate or Mr. Fleming during the assault on the officer. The State disagrees, arguing that the evidence "clearly supports a finding that the three inmates assaulted Officer Williamson together with the common plan of injuring him."

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Id.* (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). Therefore, the prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own

inferences for those drawn from the evidence by the trier of fact. *Id.* The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was convicted of aggravated assault in concert with two or more other persons. One commits the offense of aggravated assault with a deadly weapon who intentionally or knowingly "causes another to reasonably fear imminent bodily injury" by the use or display of a deadly weapon. T.C.A. §§ 39-13-101(a)(2), -102(a)(1)(B). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A person "acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id.* § 39-11-302(b). Furthermore, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* A "deadly weapon" includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(5)(B). "Bodily injury" includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(2). Tennessee Code Annotated section 39-12-302 provides that "[a] crime of force or violence committed while acting in concert with two (2) or more other persons shall be classified one (1) classification higher than if it was committed alone." Aggravated assault is a Class C felony, but it is a Class B felony when committed while acting in concert with two or more other persons. T.C.A. §§ 39-13-102(e)(1)(A)(iii); -12-302(a). The question of whether one defendant is acting in concert with another is one of fact for the jury. *Rice v. State*, 475 S.W.2d 178, 179 (1971). This Court has likened "acting in concert" with criminal responsibility in the context of a case involving the commission of a robbery. *State v. Lenardo DeQayne Spencer, Reginald Tyrone Baxter, Jr., and Deandre Jajuan Dean*, No. M2016-01219-CCA-R3-CD, 2017 WL 2800147, at *6 (Tenn. Crim. App. June 28, 2017) (citing T.C.A. § 39-11-402(2)) (explaining that a defendant "acts in concert with another if the defendant acts 'with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.'"), *perm. app. denied* (Tenn. Nov. 16, 2017)

In a light most favorable to the State, the evidence introduced at trial, including the video surveillance of the attack, shows that Mr. Tate first attacked Officer Williamson by punching him in the face and knocking him to the ground. Mr. Tate continued to beat and kick Officer Williamson and was soon joined by Mr. Fleming, who also beat and kicked the officer. Defendant comes into the frame and picks up a ninety-nine pound floor buffer, throwing it at the officer. The entire attack lasted approximately thirty

- 8 -

seconds.  Officer Williamson suffered injuries after he was hit in the head and face by the floor buffer and body parts of Mr. Tate, Mr. Fleming, and Defendant.  Defendant himself admitted that he picked up the floor buffer and threw it at the officer for his own safety.  As the trial court stated several times during the trial, the video "speaks for itself."  There was sufficient evidence from which a rational jury could have concluded that the men were acting in concert while committing the aggravated assault.

## *III.  Sentencing*

Defendant argues on appeal that the trial court's sentence fails to conform to the requirements of Tennessee Code Annotated section 40-23-101(c).  Specifically, Defendant argues that he should have been given pretrial jail credit on his fifteen-year sentence beginning in November of 2014.  Defendant asserts that the trial court's  ruling that Defendant's conviction was to run consecutively to all prior sentences, with no credit for time served while awaiting trial, supersedes and ignores the language of  Tennessee Code Annotated section 40-23-101(c).  Defendant also argues that his sentence is excessive because it does not represent the "least restrictive alternative."  The State, on the other hand, argues that the trial court did not abuse its discretion in fashioning Defendant's sentence.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness.  *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012).  This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act."  *Bise*, 380 S.W.3d at 707.  A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining."  *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)).  This deferential standard does not permit an appellate court to substitute its judgment for that of the trial court.  *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).  The defendant bears the burden of proving that the sentence is improper.  T.C.A. § 40-35-101, Sentencing Comm'n Cmts.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own

behalf; and (8) the result of a validated risk and needs assessment. T.C.A. § 40-35-210(b). The trial court should also consider the defendant's potential for rehabilitation or treatment. T.C.A. § 40-35103(5); *see also Bise*, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

This Court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)).

The trial court sentenced Defendant as a Range II offender to a sentence of fifteen years, a within-range sentence entitled to a presumption of reasonableness. *Bise*, 380 S.W.3d at 709-10. The record before this Court shows that the trial court thoroughly and completely applied the statutory sentencing principles. The trial court enhanced Defendant's sentence on the basis that he had "previous convictions or behavior, in addition to those necessary to establish the appropriate range" and because Defendant was "[i]ncarcerated in [a] penal institution on a . . . felony conviction" at the time of the commission of the offense. *See* T.C.A. § 43-35-114(1), (13). The trial court considered Defendant's conduct "serious," noting that his actions could have gotten someone "killed." The trial court noted Defendant's two prior felony drug convictions and nine prior misdemeanors. The trial court determined that confinement was necessary to avoid depreciating the seriousness of the offense and noted that rehabilitative efforts were not to be "considered" because Defendant failed to accept "responsibility for what he did." The trial court did not abuse its discretion in determining the length of Defendant's sentence.

Defendant complains that the trial court ordered his sentence to run consecutively to all of his prior sentences and that he did not receive pretrial jail credit on the service of his sentence for aggravated assault. Defendant correctly notes that whenever a defendant receives a sentence of imprisonment,

> the trial court shall . . . render the judgment of the court so as to allow the
> defendant credit on the sentence for any period of time for which the

defendant was committed and held in the city jail or juvenile court detention . . . or county jail or workhouse, pending arraignment and trial. The defendant shall also receive credit on the sentence for the time served in the jail, workhouse or penitentiary subsequent to any conviction arising out of the original offense for which the defendant was tried.

T.C.A. § 40-23-101(c). The awarding of pretrial jail credits is mandatory. *See State v. Brown*, 479 S.W.3d 200, 212 (Tenn. 2015). However, pretrial jail credits do not include time spent incarcerated on another conviction or before the commission of the offense at issue. *See State v. Frederick Cavitt*, No. E1999-00304-CCA-R3-CD, 2000 WL 964941, at *2 (Tenn. Crim. App. July 13, 2000) ("This Court has repeatedly held that [Tennessee Code Annotated] § 40-23-101(c) provides for credits against the sentence only if the incarceration, claimed as a basis for the credits, arises from the offense for which the sentence was imposed."), *no perm. app. filed*; *see also Trigg v. State*, 523 S.W.2d 375, 376 (Tenn. Crim. App. 1975) ("It is only when the time spent in jail or prison is due to or, as the statute says, 'arises out of' the offense against which the claim is credited that such allowance becomes a matter of right."). When a defendant has pretrial jail credits to be applied to consecutive sentences, the credits are applied only to the first sentence that is served; anything else would allow a defendant to "double dip." *See, e.g., Elijah Truitt v. State*, No. M2013-01848-CCA-R3-HC, 2014 WL 1408301, at *4 (Tenn. Crim. App. Apr. 10, 2014), *no perm. app. filed*; *Timothy L. Dulworth v. Henry Steward, Warden*, No. W2012-00314-CCA-R3-HC, 2012 WL 2742210, at *2 (Tenn. Crim. App. July 9, 2012) (citing *Marvin Rainer v. David G. Mills, Warden*, No. W2004-02676-CCA-R3-HC, 2006 WL 156990, at *5 (Tenn. Crim. App. Jan. 20, 2006), *no perm. app. filed*), *no perm. app. filed*. It is undisputed that Defendant was incarcerated on another offense at the time of the commission of this offense. There is no proof in the record that his prior sentence had expired before he was sentenced in this case. Defendant is not entitled to relief on this issue.

*Conclusion*

Based on the foregoing, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE